ALTUS LAW FIRM
Andrew J. Jaramillo (198303)
andrew.jaramillo@altuslawfirm.com
Sean T. Nguyen (206245)
sean.nguyen@altuslawfirm.com
5 Park Plaza, Suite 200
Irvine, California 92614
(949) 346-3391

Attorneys for Plaintiff
WENDY CUNNING

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WENDY CUNNING, an individual, | Case No.: |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **(1) Violation of Whistleblower Protections under the Sarbanes-Oxley Act (18 U.S.C. § 1514A *et seq.*);** |
| SKYE BIOSCIENCE, INC., a Nevada Corporation; and DOES 1-10, inclusive, | |
| Defendant. | **(2) Retaliation under California Labor Code § 1102.5;** |
| | **(3) Wrongful Termination in Violation of Public Policy;** |
| | **(4) Intentional Inflection of Emotional Distress** |
| | **JURY TRIAL DEMANDED** |

Plaintiff WENDY CUNNING (hereinafter "Plaintiff"), on behalf of herself, demanding trial by jury of all issues joined herein, alleges as follows:

## THE PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is, and at all times mentioned herein was, a resident of Orange County California.

-1-

2.     Defendant SKYE BIOSCIENCE, INC. ("Defendant" or "the Company") is a corporation organized and existing under the laws of the state of Nevada and – despite multiple name changes and office relocations – has always operated from its principal place of business in California. Defendant was first organized in 2015 and was originally named "Nemus Bioscience, Inc." At that time, its principal place of business was Costa Mesa, California. Shortly thereafter, however, it relocated its principal place of business to Long Beach, California. On or around March 25, 2019, Defendant changed its named to "Emerald Bioscience, Inc." On or around August 2020, Defendant again relocated its principal place of business, this time to San Diego, California. Finally, on or around January 15, 2021, Defendant changed its name again to its current iteration.

3.     Plaintiff does not presently know the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive. Plaintiffs will seek leave of court to amend this Complaint to allege said defendants' true names and capacities as soon as plaintiff ascertains them.

4.     Defendant is a biopharmaceutical company that focuses on the development and commercialization of bioengineered cannabinoid-based therapeutics. The Company's lead product candidate is NB1111, for the treatment of glaucoma, but its products pipeline can be used for other ocular therapeutics.

5.     Plaintiff was an employee of Defendant until she was wrongfully terminated on July 18, 2019.

6.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. §1331. This is a civil action arising under the Constitution, laws, or treaties of the United States. The jurisdiction of this Court over the subject matter of this action is further predicated on 28 U.S.C. §1367, as all claims in this matter form part of the same case or controversy.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to the claims alleged herein arose in Los Angeles County, when Defendant's principal place of business was in Long Beach, California.

-2-

COMPLAINT

8. Additionally, under 28 U.S.C. §1391(c), Defendant is subject to this Court's personal jurisdiction with respect to this civil action because at all relevant times during Plaintiff's employment, Defendant was authorized to transact business within the Los Angeles County, California. Defendant conducted day-to-day commercial activities within Los Angeles County. Thus, Defendant has engaged in substantial, continuous, and systematic activities within Los Angeles County, providing for a fair and reasonable basis for the exercise of personal jurisdiction over Defendant by this Court in this venue.

9. Additionally, Plaintiff has satisfied all administrative prerequisites necessary to bring this action. On January 3, 2020, Plaintiff timely filed a complaint with the United States Department of Labor's ("DOL") Occupational Safety and Health Administration ("OSHA") setting forth arguments and data to establish that Defendant violated several laws, including the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX").

10. Because more than one hundred and eighty (180) days have passed since Plaintiff filed her complaint with OSHA, and given that it did not conclude its investigation in an expeditious timeframe, Plaintiff is entitled to seek judicial action in federal district court.

11. Accordingly, Plaintiff has exhausted all requisite administrative remedies and will file a copy of the file-stamped complaint with the OSHA within seven (7) days after the date of this filing.

## UNDERLYING FACTUAL ALLEGATIONS

12. On April 20, 2016, Defendant, then known as Nemus Bioscience, entered into an Independent Consultant Agreement with Plaintiff to provide services to the company.

13. In March 2018, Defendant hired Plaintiff as its Vice President of Business Operations, reporting to the Company's Chief Executive Officer, Dr. Brian Murphy ("Dr. Murphy"). In that role, Plaintiff managed all business operations, which included supporting pre-clinical and clinical development operations, leading all new product planning activities, business development and set forth the corporate strategy for Defendant and supported Dr. Murphy in investor relations activities.

-3-

**Defendant's Deceptive Press Release on its THC Treatment**

14.     One of Defendant's principal therapeutics is using its THC treatment for glaucoma. To that end it retained Glauconix Biosciences ("Glauconix") to test the treatment's efficacy.

15.     Glauconix studied three donors in total and while its February 2019 preliminary findings were encouraging, found that one of the donors did not respond to the THC treatment.

16.     Notably, in its preliminary analysis on February 1, 2019, Glauconix concluded that additional donors would be needed to confirm the effectiveness of the treatment and how Defendant's treatment effected diseased tissue:

> Donor 2 glaucomatous-induced 3D-HTM samples did not respond to any of the THC treatments. **Additional donors are needed** to confirm the efficacy of THC in glaucomatous HTM."

> "It is important to note that at the protein level for 0.1 μM and 0.5 μM THC, no significant changes in paxillin or alpha smooth muscle actin were observed; this may be due to not enough donors used in the experiments. **Additional donors may be needed**. (Emphasis added).

17.     Accordingly, Glauconix asked on several occasions to study more donors, and even in its *final* study report provided on April 3, 2019, it determined that an additional two donors were needed:

> We believe that using 2 new donors will help shed additional insight on the mechanism of action trends we have already observed in SOW No. 1. Hopefully, this add-on work will provide more strength/significance to the existing data.

18.     Nevertheless, Dr. Murphy intentionally and misleadingly issued press-release on March 12, 2019, based on incomplete data and well ahead of the final study report. Despite Glauconix repeatedly informing Defendant of its study's limitations and that more donors were needed, the March 12, 2019 press release nevertheless overstated the study's finding in asserting that "**These studies were significant across a spectrum of findings**." (Emphasis added).

-4-

19.     Plaintiff did not realize the ramifications of Dr. Murphy's fraudulent press release until a week later, as she was on vacation at the time the press release was drafted and issued.

20.     When Plaintiff pressed Dr. Murphy about further studies that Glauconix had repeatedly requested Defendant to conduct, Dr. Murphy admitted that his March 12, 2019 press release was based on incomplete data, but he refused to authorize the additional studies because it would require him to ask Defendant's board of directors to spend more money.

21.     As Dr. Murphy had intended, the March 12, 2019 press release generated significant positive publicity for Defendant, including press coverage about the study and its purported findings. Defendant's share price would shortly thereafter hit an all-time high.

22.     Dr. Murphy fully understood the significance and illegality of the press release because he had sent to Plaintiff two separate emails in September 2018 discussing SEC enforcement actions warning that cannabinoid startups (like Defendant) often issue false or misleading information, including press releases.

23.     One SEC alert specifically warned about companies that spread false information and issue implausible press releases:

> Fraudsters may manipulate stock prices (for example, causing them to rise or fall dramatically) by spreading false and misleading information about a company. Microcap stocks, some of which are penny stocks and/or nanocap stocks, may be more susceptible to market manipulation than stocks of larger companies. This is because information about microcap companies may be hard to find and microcap stocks historically have less liquidity. Be cautious if you spot red flags of microcap fraud:
>
> False press releases. **Press releases that seem implausible may indicate that the company's stock is being hyped solely to drive up its stock price**. (Emphasis added).

24.     To cover up his malfeasance, Dr. Murphy attempted to ascribe to Plaintiff authorship of a publication regarding the Glauconix study to be presented at the American Academy of Ophthalmology (AAO), despite Plaintiff not meeting authorship criteria and

1   explaining so several times to him. Plaintiff, who did not want to be associated with the

2   deceptive study results and knew she did not meet authorship criteria, therefore resisted Dr.

3   Murphy's multiple attempts to include her as an author.

4   **Defendant's Other Fraudulent Acts That Deceived Investors**

5            25.     Dr. Murphy also reported grossly inaccurate market sizing analyses to Emerald's

6   investors, its board of directors, the licensor (the University of Mississippi ("UM")), and the

7   media about both the non-alcoholic steatohepatitis (NASH) and the endometriosis therapeutic

8   areas in June 2019. He did so by changing Plaintiff's findings and presented her work in a

9   deceptive manner. During a meeting on July 9, 2019, Plaintiff questioned Dr. Murphy about how

10  and where he obtained the market size numbers, as they were different than those in the reports

11  she had seen. She followed up again the following day and this finally prompted Dr. Murphy to

12  report the correct market size numbers.

13           26.     In 2018, Dr. Murphy provided insider information to a key shareholder regarding

14  the inner workings of the company (at the time still Nemus Bioscience) and Emerald Health

15  Sciences, Inc. ("EHS"), Defendant's majority shareholder. More specifically, Dr. Murphy shared

16  details with this investor about the board of directors' decisions regarding the company's

17  development prioritization, releasing key licenses back to UM and other the tradeoff decisions

18  with other cannabinoid companies within the EHS family of companies.

19           27.     Dr. Murphy admitted to Plaintiff that he was attempting to convince this investor

20  to provide funds for him to start his own cannabinoid company and promised to take her over

21  with him to the new company. Given the obvious conflict of interest with her position and

22  fiduciary duty to the company, Plaintiff declined, to Dr. Murphy's dismay.

23           28.     Later, Dr. Murphy revealed to Plaintiff that the investor had declined to invest in

24  his proposed new company and had instead simply sold all his shares in Defendant. Plaintiff told

25  Dr. Murphy that this might be considered insider trading and problematic, but Dr. Murphy

26  ignored her protest.

27           29.     Dr. Murphy also recommended releasing several of the company's cannabinoid

28  licenses back to UM while simultaneously seeking a job as CEO at a competing company,

-6-

COMPLAINT

Teewinot Life Sciences ("Teewinot"), with the intention of getting those released licenses signed under Teewinot.

30.     Dr. Murphy also convinced Defendant's Board of Directors to release all but the ocular licenses back to University of Mississippi ("UM") in order to further his personal interests. He informed Plaintiff that he had successfully convinced the Board to return the licenses back to UM, which he planned to later acquire as the CEO of a different company.

31.     It was only after that company refused to offer him the CEO position, but instead a lesser role, that Dr. Murphy went back to Defendant's Board to convince its members to change their collective mind in relinquishing the licenses because they might be used by the other company to compete and undercut Defendant's own strategic plans.

32.     Plaintiff engaged in protected activity when she complained and protested numerous times to Dr. Murphy about multiple violations of law. Plaintiff reasonably believed that the company's conduct – misleading investors and insider trading – were violations of SOX, securities laws and other possible legal violations, particularly since Dr. Murphy signed all of the company's quarterly and annual filings and made multiple presentations to investors based on false and/or misleading information.

33.     As a result of Plaintiff's repeated protests against Dr. Murphy's above deceptive acts, she was retaliated against. Specifically, Plaintiff's role in the company was marginalized and she was assigned demeaning administrative tasks (while simultaneously denying her calendar functions to perform them) and was removed from key vendor meetings for the company, something pivotal to Plaintiff's role as its Vice President of Operations. Ultimately, Defendant terminated Plaintiff on July 18, 2019, because of her complaints and protests.

34.     After Plaintiff was terminated, Plaintiff raised each of the above wrongful and illegal acts to Defendant through its Board of Directors and attorneys. However, Defendant ignored Plaintiff's notifications, retained Dr. Murphy and denied his unlawful acts in an effort to conceal Defendant's wrongdoing to the public and investors.

COMPLAINT

## **FIRST CLAIM FOR RELIEF**

### **RETALIATION IN VIOLATION OF SARBANES-OXLEY ACT, 18 U.S.C. § 1514A**

35.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs of the Complaint as though fully stated herein.

36.     SOX prohibits a publicly traded company, including its subsidiaries and affiliates, from discriminating against an employee for reporting information that the employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities or commodities fraud, a violation of any SEC rule or regulation, or any provision of federal law relating to fraud against shareholders, when the information is provided to a federal regulatory or law enforcement agency, a person with supervisory authority over the employee, or any other person working for the employer who has the authority to investigate, discover, or terminate misconduct. Specifically, 18 U.S.C. §1514A(a)(1)(c) provides that:

> No [publicly-traded] company. . . or any officer, employee, contractor, subcontractor, or agent of such company . . . may discharge . . . an employee . . . because of any lawful act done by the employee . . to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to . . . a person with supervisory authority over the employee . . . .

37.     Plaintiff engaged in activity protected under SOX by complaining about and protesting Defendant's conduct which she reasonably believed constituted a violation of SOX, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal Law relating to fraud against shareholders and potential investors. These included, but are not limited to, violating SEC Rule 10-b5, 17 CFR § 240.10b-5 (prohibiting misrepresentations or omissions made in connection with the sale of a security and prohibiting insider trading), and violating SOX sections 302, 15 U.S.C. §7241 and 404, 15 U.S.C. §7262 (prohibiting filing of financial reports with the SEC that contain material untrue or misleading statements).

38.     Plaintiff provided this information and protested against the unlawful acts to Defendant's CEO and its Chief Financial Officer.

39.     Defendant retaliated against Plaintiff by marginalizing her, taking away her job duties, and, ultimately, terminating her employment.

40.     Defendant acted intentionally with malice and reckless disregard for Plaintiff's rights under SOX.

41.     Defendant's actions have caused and will continue to cause Plaintiff substantial economic loss, including lost salary, bonuses, benefits, equity grants, and other compensation, damage to her professional reputation, and emotional distress.

42.     Plaintiff is entitled to recover attorneys' fees and costs for bringing this action pursuant to SOX.

## SECOND CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE § 1102.5(b)

43.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs of the Complaint as though fully stated herein.

44.     At all times mentioned herein, California's Whistleblower Protection Act, Labor Code Section 1102.5, was in full force and effect and was fully binding upon Defendants. Subsection (b) of that statute prohibits employers from retaliating against their employees:

> "for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

45.     Labor Code Section 1102.5 (c) further expands California's whistleblower protection to employees who, like Plaintiff, refuse to "to participate in an activity that would

-9-

result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

46.     Defendant retaliated against Plaintiff by, among other things, terminating her employment because she complained about, and refused to participate in, Defendant's numerous violations of state and federal law, including but not limited to violating SEC Rule 10-b5, 17 CFR § 240.10b-5 (prohibiting material misrepresentations or omissions made in connection with the sale of a security and prohibiting insider trading), SOX sections 302, 15 U.S.C. §7241 and 404, 15 U.S.C. §7262 (prohibiting filing of financial reports with the SEC that contain material untrue or misleading statements), California Corporations Code § 25401 (prohibiting untrue statements in connection with the offer, sale or purchase securities).  In doing so, Defendant violated Labor Code Section 1102.5.

47.     As a direct, foreseeable and proximate result of Defendant's unlawful actions, Plaintiff has suffered economic damages including back pay, front pay, equity, benefits and other compensation.

48.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered severe emotional distress, humiliation, shame, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

49.     Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Furthermore, all such actions by Defendant, its employees and agents, and each of them as herein alleged, were known, ratified and approved by the officers or managing agents of Defendant. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## THIRD CLAIM FOR RELIEF

## WRONFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

50.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs of the Complaint as though fully stated herein.

51.     Defendant illegally terminated Plaintiff from her employment because of her complaints about, and refusal to participate in, Defendant's violation of California's wage and hours laws and federal and state health and safety laws, as described herein.  This termination was in violation of the public policies expressed in SOX, California Labor Code Section 1102.5, and various state and federal laws prohibiting fraud and insider trading.

52.     As a direct, foreseeable and proximate result of Defendant's unlawful actions, Plaintiff has suffered economic damages including back pay, front pay, equity, benefits and other compensation.

53.     As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered severe emotional distress, humiliation, shame, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

54.     Defendant committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Furthermore, all such actions by Defendant, its employees and agents, and each of them as herein alleged, were known, ratified and approved by the officers or managing agents of Defendant. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

## FOURTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

55.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs of the Complaint as though fully stated herein.

56.     By engaging in the conduct described herein including but not limited to the unlawful and retaliatory acts set forth above, Defendant intentionally inflicted emotional distress upon Plaintiff. Specifically, Defendant's conduct was extreme and outrageous in that it exceeded all bounds of that usually tolerated in a civilized community. Further, Defendants' conduct was undertaken with the intent of causing, or in reckless disregard of the probability of causing,

COMPLAINT

severe emotional distress to Plaintiff. Finally, Plaintiff did, in fact, suffer severe or extreme emotional distress, and this was proximately caused by Defendant's actions.

57.   As a direct, foreseeable and proximate result of Defendant's unlawful actions, Plaintiff has suffered economic damages including, but not limited to, substantial losses of earning and other employment benefits and long-term losses in her income caused by the unlawful termination he suffered, and she has not been able to obtain subsequent employment.

58.   As a direct, foreseeable, and proximate result of Defendant's conduct, as alleged herein, Plaintiff has suffered and continues to suffer general damages and emotional distress in the form of financial distress, great anxiety, severe stress, depression, loss of sleep, loss of enjoyment of life, humiliation, embarrassment, anger, the precise amount of which will be proven at trial.

**WHEREFORE Plaintiff seeks judgment against Defendant:**

A.   Awarding Plaintiff "all relief necessary to make [her] whole" pursuant to 18 U.S.C. § 1514A(c)(1) & (2)(B), including, but not limited to:

1.   Awarding Plaintiff her monetary damages consisting of back pay, with interest, as well as front pay in an amount not readily ascertainable but to be determined upon a full trial on the merits;

2.   Awarding Plaintiff her monetary damages for the retaliatory deprivation of her likely equity awards by Defendant in an amount not readily ascertainable but to be determined upon a full trial on the merits.

3.   Awarding Plaintiff emotional distress damages for the anxiety and emotional distress which she experienced from her retaliatory discharge in an amount not readily ascertainable but to be determined upon a full trial on the merits.

4.   Pay a civil penalty of $10,000 for each violation under Labor Code §1102.5.

5.   Awarding Plaintiff reputational damages for the reputational harm that she has experienced from her retaliatory discharge in an amount not readily ascertainable but to be determined upon a full trial on the merits.

COMPLAINT

6.      Compensating Plaintiff for all additional special damages sustained as a result of the discharge and retaliation, including litigation costs, expert witness fees, and reasonable attorney fees; and

7.      Granting such other and further relief as the Court deems appropriate.

B.     Awarding Plaintiff all other remedies available under the law.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial pursuant to Federal Rule of Civil Procedure 38(a).

Dated: April 16, 2021

/s/ Sean T. Nguyen
ALTUS LAW FIRM

Attorneys for Plaintiff
WENDY CUNNING

-13-

COMPLAINT