**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES—GENERAL**

Case No. 8:21-cv-00710-DOC-KES    Date: December 18, 2025

Title: WENDY CUNNING v. AVTAR DHILLON

---

PRESENT:

THE HONORABLE KAREN E. SCOTT, U.S. MAGISTRATE JUDGE

| Jazmin Dorado | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

PROCEEDINGS (IN CHAMBERS):   Order re Motion to Transfer Case, Motion to Compel, Motion for Sanctions (Dkt. 330)

For the reasons explained below, the motion filed by Wendy Cunning ("Cunning") to compel the further deposition of Dr. Avtar Dhillon ("Dhillon" or "Dr. Dhillon") is granted in part and denied in part.

**I.    PROCEDURAL HISTORY**

Cunning is suing Skye Bioscience, Inc. ("Skye"), her former employer, in <u>Cunning v. Skye Bioscience, Inc.</u>, No. 8:21-cv-00710-DOC-KES (C.D. Cal.) ("<u>Cunning I</u>") for retaliatory termination under the Sarbanes Oxley Act, 18 U.S.C. § 1514A, and the California Whistleblower Protection Act, Cal. Labor Code § 1102.5(b).  (<u>Cunning I</u>, Dkt. 27 (First Amended Complaint).)

   **A.    Dhillon's Criminal Guilty Plea.**

In September 2022, Dhillon entered a criminal plea agreement with the U.S. Attorney for the District of Massachusetts.  <u>Cunning v. Dhillon</u>, No. 8:25-mc-0023-DOC-KES (C.D. Cal.) ("<u>Cunning II</u>"), Dkt. 3 at 80 (Kotchen Decl. Ex. 5).[1]  He waived indictment and pled guilty to three counts in a criminal information: (1) willful failure to disclose stock sales under 15 U.S.C.

---

[1] Unless otherwise noted, this order uses the page numbers imposed by the federal courts' online filing systems, which appear in blue in the header of filed documents.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES            Date: December 18, 2025
                                                                                                 Page 2

§ 78p(a)(3)(B) and 78ff(a) and 17 C.F.R. § 240.16a-3(a) (count 1); (2) sale of unregistered securities, aiding and abetting under 15 U.S.C. §§ 78e(a)(1), (c), 77x and 18 U.S.C. § 2 (count 2); (3) touting compensation nondisclosure conspiracy under 18 U.S.C. § 371 (and count 3). (Id. at 80 (plea agreement); United States v. Dhillon, No. 1:22-cr-10265-ADB (Dist. Mass. Sept. 30, 2022) (information at Dkt. 32).[2]

      All of these counts related to the ownership and sale of shares in a company called Arch Therapeutics, which were held by another company called Walk on Water, allegedly in order to conceal Dhillon's beneficial ownership thereof. (See Dhillon, No. 1:22-cr-10265, Dkt. 32 at 6 ¶¶ 17, 19.) A related criminal complaint filed in August 2022 alleged that there was probable cause to believe that Dhillon had also committed similar crimes in connection with the ownership and sale of shares in another company, OncoSec, which were held by a company named MMXI to conceal his beneficial ownership. However, charges related to OncoSec were not included in the information. (Compare Dkt. 3 at 49 ¶ 40 (complaint, alleging Dhillon and an unnamed co-conspirator "engaged in a nearly identical scheme involving shares of OncoSec held by MMXI for Dhillon's benefit") with Dhillon, No. 1:22-cr-10265, Dkt. 32 (information, which does not mention OncoSec).)

      Dhillon cooperated with the government by sitting for multiple interviews, participating in proffers, and testifying over two days at a Securities and Exchange Commission ("SEC") trial held in September of 2023 in the U.S. District Court for the District of Massachusetts. (Dkt. 5 at 6 (Appendix, Exs. C & D).)

      He was sentenced to 4 months in prison on each count, to run concurrently. (Cunning II, Dkt. 3 at 90 (criminal judgment, Kotchen Decl. Ex. 6).) After he served the custodial portion of his sentence, he was taken into custody by U.S. Immigration and Customs Enforcement ("ICE") for removal to Canada, his country of origin. He is currently detained at ICE's El Paso Servicing Processing Center in Texas with limited access to counsel.

### B.     First Trial and Reversal of Civil Judgment by the Ninth Circuit.

      The civil case filed by Cunning went to trial in January 2023, and the jury found for Cunning. (Cunning I, Dkt. 165.) Skye appealed, and in October 2024, the Ninth Circuit reversed and remanded for a new trial. (Cunning I, Dkt. 241.) The Ninth Circuit held in relevant part:

> [T]he district court abused its discretion in admitting Dr. Dhillon's guilty plea and SEC judgment. This evidence should have been excluded under Federal Rule of Evidence 403 because it had very little probative value, if any at all, and it was highly prejudicial. … The evidence was prejudicial because it allowed the jury to

---

[2] The Court takes judicial notice of the criminal information, which it appears was not included in the parties' briefing. See Fed. R. Evid. 201.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES                                                                 Date: December 18, 2025
                                                                                                                              Page 3

> impute onto Skye Dr. Dhillon's unrelated misconduct, related in his indictment [sic], guilty plea, and conviction. … [T]his evidence was not relevant to show Cunning's state of mind or a possible reason why she did not complain to the board. The plea and judgment were entered long after Cunning was terminated from Skye, and they therefore could not have affected her decision not to raise her complaints with the board.
>
> [¶] Cunning argues that the plea and judgment were nonetheless relevant because they showed that Cunning's concerns were "legitimate." … That later events may have vindicated Cunning's suspicions was of no import. Skye's decision to raise an issue about Cunning's failure to complain to Dr. Dhillon, which opened the door to limited testimony from Cunning about why she didn't complain to Dr. Dhillon, did not all the sudden render his every misdeed relevant to her case, and particularly not those misdeeds which had nothing to do with Skye but with another firm. In other words, Skye may have opened the door, but it did not open the floodgates. …
>
> [n.2:] Skye also challenges Dr. Dhillon's invocations of his Fifth Amendment privilege as irrelevant because the district court declined to give an adverse inference instruction, and Skye argues that the district court erred in not "mak[ing] an appropriate inquiry into the basis" for Dr. Dhillon's repeated invocations of the privilege. See United States v. Vavages, 151 F.3d 1185, 1192 (9th Cir. 1998). Because we conclude that the admission of Dr. Dhillon's guilty plea and SEC judgment was reversible error regardless the relevance of or basis for Dhillon's invocations, we do not reach those issues here. On remand, the parties and the district court are free to revisit the admissibility of Dr. Dhillon's invocations, including by assessing their foundation, in light of our holding that Dr. Dhillon's guilty plea and SEC judgment are inadmissible on this record.

(Id. at 3-5 (one footnote omitted).)

A new jury trial is currently set for February 10, 2026. (Cunning I, Dkt. 325, 326.)

**C.      Most Recent Deposition of Dhillon.**

On September 17, 2025, Cunning's counsel deposed Dhillon in Texas, where he is in ICE custody. (Cunning II, Dkt. 192 (deposition transcript).) Dhillon refused to answer all of the questions he was asked, invoking his Fifth Amendment right against self-incrimination as to each question. (Id.)

On October 1, 2025, Cunning moved to compel Dhillon to answer her questions and for sanctions, including an adverse inference against Skye. (Cunning II, Dkt. 1, Dkt. 330.) The motion was filed in the Western District of Texas, but Cunning asked to transfer the motion here

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:21-cv-00710-DOC-KES　　　　　　　　　　　　　　　　　Date: December 18, 2025
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 4

due to its relationship to Cunning I.

On October 8, 2025, Dhillon filed a response that did not oppose the transfer but opposed other aspects of the motion. (Cunning II, Dkt. 5.) Dhillon argued, inter alia, that Cunning had not properly conferred with opposing counsel before filing the motion, in violation of a Texas Local Rule. (Id. at 7.) Dhillon offered a "compromise": that Cunning "provide Dhillon with a list of specific questions in advance," to allow Dhillon to "confer with his criminal defense counsel and decide, question by question, whether answering could incriminate him." (Id. at 14.) Dhillon argued that the relevance of certain questions posed at the deposition—e.g., "the status of Dhillon's Canadian medical license, whether he will testify at trial, or other documents he had at the deposition"—were of dubious relevance and "such information could instead be provided by declaration or stipulation." (Id.)

On October 8, 2025, the Texas court transferred the motion to this Court. (Cunning II, Dkt. 6.)

On October 10, 2025, Skye moved to intervene and oppose the motion. (Cunning II, Dkt. 10.) On October 21, 2025, Cunning filed a reply, which dropped the request for adverse inference sanctions against Skye. (Cunning II, Dkt. 19.) The Court nevertheless granted Skye's motion to intervene. (Cunning II, Dkt. 26.)

In early October, after the motion to compel was filed, counsel for Cunning and Dhillon exchanged some emails about the dispute. (Cunning II, Dkt. 29 at 39-45.) On October 26, 2025, Dhillon's counsel sent Cunning's counsel a formal meet-and-confer letter in which he included his answers to some of the deposition questions in the form of a chart. (Id. at 5-31.) The letter argued, "In our view, there is no genuine need to depose him again and re-ask these questions. This is because, depending on the specific question, a substantive response is not necessary for the upcoming retrial, already known by you, easily obtained from another readily available source, or suitable for stipulation by the parties." (Id. at 5.)

On October 28, 2025, the District Judge held a status conference with the parties and referred Cunning's motion to compel Dhillon's further deposition to the Magistrate Judge. (Cunning II, Dkt. 30.) The Magistrate Judge set the motion for a hearing on November 4, 2025. (Cunning II, Dkt. 27.)

On October 31, 2025, Dhillon filed a declaration from Douglas Barritt in opposition to the motion attaching the parties meet-and-confer correspondence. (Cunning II, Dkt. 29.) Cunning moved ex parte to strike the declaration. (Cunning II, Dkt. 32 (ex parte application), Dkt. 34 (Dhillon's opposition to the ex parte application), Dkt. 35 (Cunning's reply in support of the ex parte application.)

At the November 4th hearing, the Magistrate Judge denied the ex parte application and directed the parties to file further briefing on the underlying motion to compel. (Cunning II, Dkt.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES  Date: December 18, 2025
Page 5

36 (minutes); Dkt. 42 (transcript).) The parties timely did so. (Cunning II, Dkt. 37 (brief from Cunning), Dkt. 38 (opposing briefing from Dhillon); Dkt. 40 (reply brief from Cunning.) The motion is now ripe for decision.

On December 5, 2025, the District Judge ordered that the two related cases, Cunning I and Cunning II, be consolidated and that further filings be docketed in Cunning I. (Cunning II, Dkt. 41.) The motion to compel Dhillon's deposition was refiled in Cunning I. (Cunning I, Dkt. 330.)

## II.   LEGAL STANDARD

"[I]n the civil context, the invocation of the privilege [against self-incrimination] is limited to those circumstances in which the person invoking the privilege *reasonably believes* that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner." Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1263 (9th Cir. 2000) (emphasis added). The standard is objective rather than subjective. See United States v. Lang, No. 06-cv-2648, 2010 WL 11509018, at *2, 2010 U.S. Dist. LEXIS 158152, at *5 (S.D. Cal. Sep. 10, 2010) ("The privilege will not be upheld merely because the person asserting it believes his assertion to be reasonable.").

"An assertion of the privilege does not require an imminent criminal prosecution or investigation." Boudjerada v. City of Eugene, No. 20-cv-01265, 2022 WL 15339414, at *5, 2022 U.S. Dist. LEXIS 195659, at *12 (D. Or. Oct. 27, 2022). It "does not depend upon the *likelihood*, but upon the *possibility* of prosecution' and also covers those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence." Glanzer, 232 F.3d at 1263 (emphasis in original; citation omitted).

"A possibility of prosecution exists where the witness has not received a grant of immunity, the statute of limitations has not run, double jeopardy does not apply, and there are no other concrete indications that criminal prosecution is barred." Englebrick v. Worthington Indus., Inc., 670 F. Supp. 2d 1048, 1050 (C.D. Cal. 2009) (citing Glanzer, 232 F.3d at 1263); see also Boudjerada, 2022 WL 15339414, at *5, 2022 U.S. Dist. LEXIS 195659, at *12 (same).

"In order to assert the privilege, witnesses 'must show that their testimony would 'support a conviction under a federal criminal statute' or 'furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.''" United States v. Vavages, 151 F.3d 1185, 1192 (9th Cir. 1998) (quoting United States v. Rendahl, 746 F.2d 553, 555 (9th Cir. 1984)). "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." Hoffman v. United States, 341 U.S. 479, 486 (1951). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES                        Date: December 18, 2025
                                                                                      Page 6

because injurious disclosure could result." Id. at 486-87.

"The only way the privilege can be asserted is on a question-by-question basis, and thus as to each question asked, the party has to decide whether or not to raise his Fifth Amendment right." Glanzer, 232 F.3d at 1263. "The proper procedure is for the witness to answer, under oath, those questions he can without risking self-incrimination." Lang, 2010 WL 11509018, at *3, 2010 U.S. Dist. LEXIS 158152, at *5-6. "It is … improper for the deponent's attorney to instruct the deponent not to answer each and every question." Angel v. Martinez, No. 13-cv-0499, 2014 WL 12788962, at *2, 2014 U.S. Dist. LEXIS 204313, at *5 (D.N.M. Aug. 1, 2014) (finding a violation of Fed. R. Civ. P. 30(c)(2) where the deponent appeared for the deposition but "the only question it appears he was willing to answer was as to his name," and he "would not answer whether he had his deposition taken before, what is his date of birth, where he lives, etc."); see generally Fed. R. Civ. P. 30(b)(2) ("A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).").

If a court later finds that a deponent improperly invoked his Fifth Amendment rights, the court "can order the deposition to be reopened, order the deponent to respond, and order the deponent to pay the costs of reopening the deposition." Singleton v. Bonds, No. 8:22-cv-01826-MRA-KES, 2024 U.S. Dist. LEXIS 117971, at *4 (C.D. Cal. July 3, 2024) (citing Fed. R. Civ. P 37(a)(3)(B)(i) and (a)(5)).

### III.   DISCUSSION

Cunning divides the questions Dhillon was asked at the September 2025 deposition into two categories. She first indicated the categories by highlighting the questions in either yellow or green in the deposition transcript. The parties later addressed each question in chart form. Cunning II, Dkt. 19-2 at 3-12 (highlighted deposition transcript); see also Dkt. 37 at 22-45 (chart in Cunning's supplemental brief, listing the questions and Cunning's position); Cunning II, Dkt. 38 at 28-101 (Dhillon's response to the chart).[3]

The two general categories are: (1) yellow: questions which Cunning argues could not subject Dhillon to any criminal liability and which Dhillon has largely agreed to answer; and (2) green: questions that Cunning admits are about criminal conduct but which, she argues, cannot reasonably lead to prosecution because they are (a) outside of the statute of limitations, (b) about publicly available documents, or (c) about Cunning's termination (a civil matter).

---

[3] The chart first appeared in meet-and-confer correspondence exchanged between the parties, and Dhillon complains that the numbering system is different between the court briefing and that correspondence. (Dkt. 38 at 28.) This order uses the numbering in Cunning's briefing rather than the numbering in the meet-and-confer correspondence.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:21-cv-00710-DOC-KES                                    Date: December 18, 2025
                                                                                                   Page 7

This Order first addresses the green questions that Dhillon has not agreed to answer.

A.      **Questions Dhillon Has Not Agreed to Answer (Green Category).**

   1.      **Questions About Criminal Conduct to Which, According to Cunning, Dhillon Already Pled Guilty.**

Cunning argues, "Any questions asked about the details of the conduct to which Dhillon pleaded guilty are not subject to an appropriate Fifth Amendment invocation." (Dkt. 37 at 13.) Cunning argues that this logic applies to Question #s 59 and 61. (See Dkt. 40 at 15 ("[T]here is no reason he should not answer questions about conduct to which he has already pleaded guilty. See Questions No. … 59, 61."); id. at 87 (in chart, arguing Question #59 "relates to conduct for which Dhillon already pleaded guilty, such that he has no valid Fifth Amendment claim").)[4] Dhillon, in contrast, characterizes these questions as concerning an alleged *Skye* "pump and dump" scheme, i.e., a separate scheme from the crimes to which he pled guilty in 2022. (See Dkt. 38 at 78, 80; Dkt. 29 at 28-29 (meet-and-confer letter dated Oct. 26, 2025).)

Upon reviewing the questions, the Court finds that they are not about criminal conduct to which Dhillon previously pled guilty.

   a.      Question #59

In Question #59, Cunning's counsel asked, "The 759 numbered company [defined in other questions as '0903759BC Limited' (27:25-28:2, 28:17-20)] also held shares in a company you are affiliated with called OncoSec that were later sold for your benefit; correct?" (29:19-21.)[5] As noted above in Section I.A., the criminal information to which Dhillon pled guilty did not charge him with any crimes related to shares of OncoSec, although the related criminal complaint did discuss a similar scheme involving OncoSec.

Cunning may be arguing that the government agreed not to prosecute Dhillon for these alleged crimes related to OncoSec because Dhillon's plea agreement stated, "The U.S. attorney agrees not to charge [Dhillon] with additional offense beyond those identified above based on the information about [Dhillon's] conduct that is known to the U.S. Attorney at this time." (Dkt. 4 at 81 ¶ 1 (plea agreement, Kotchen Decl. Ex. 5).) However, as Dhillon points out, this plea agreement binds only the U.S. Attorney for the District of Massachusetts, not any other U.S. Attorney. It is not clear that Massachusetts is the only place where such crimes could be prosecuted. For example, the criminal complaint alleged that the companies involved – OncoSec and MMXI – were located in New Jersey and/or California. (Dkt. 3 at 41 ¶¶ 15, 18.)

---

[4] Cunning also includes Questions #6 and 7 in this section, but Dhillon has agreed to answer these. (Dkt. 38 at 32-33.) They are therefore discussed further below in section III.B.

[5] The deposition transcript is Exhibit 4 of the Kotchen Declaration (Dkt. 3 at 59).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES  Date: December 18, 2025
Page 8

Accordingly, Dhillon has shown that he may have a reasonable fear of prosecution for the activities discussed in this question.

      b.      Question #61

In Question #61, Cunning's counsel asked, "You never filed any documents with the SEC disclosing that you were the beneficial owner of the 759 numbered company account, even though you were a Skye insider, and required to make such disclosures; correct?"  (30:10-13.)

This question is not about the sale of shares of either Arch Therapeutics or OncoSec, the two companies discussed in the Massachusetts criminal information and complaint.  It appears to be about the "Skye pump and dump scheme," which is discussed further below.

      **2.**      **Questions About the Skye Pump and Dump Scheme.[6]**

Like Question #61, the other questions in the "green" category are about the alleged Skye pump and dump scheme.  Cunning described this alleged scheme in her opposition to a recent motion in limine, as follows:

> In January 2018, EHS gained a majority share in Skye, receiving in excess of 35,000,000 million shares (in actual shares and warrants to purchase shares) of Skye's stock. … Skye was developing a cannabinoid product to treat glaucoma using a molecule known as THCVHS. … Glauconix was a vendor that had a highly predictive model to test the potential efficacy of THCVHS for glaucoma on humans. …
>
> With Glauconix testing in the works, under the leadership of Avtar Dhillon and Punit Dhillon, EHS [Emerald Health Sciences] began to acquire vast amounts of security in Skye (at a highly favorable rate), as Skye's insider trading and pump and dump scheme took root in earnest.  The scheme involved a brand-new arrangement EHS entered with Skye called the "Multi Draw Credit Agreement," which was signed on October 5, 2018. … Under the arrangement, EHS would loan Skye up to $20 million in exchange for warrants entitling EHS to purchase Skye stock at a (highly-favorable) price of 50 cents a share. … Skye's Board had to approve how much EHS loaned Skye and how Skye spent EHS loans. … Three of Skye's four board members were EHS board members: Avtar Dhillon (who served as Executive Chairman of both boards), Punit Dhillon, and Jim Heppell. … In other words, Skye operated as EHS's alter ego, and EHS controlled the activities of Skye.  On the same date that EHS and Skye entered the Multi Draw

---

[6] The Court notes that this category includes Question #s 64 and 65.  Although Cunning designated them as "yellow" category questions, Dhillon has not agreed to answer them and asserts that they are related to the Skye pump and dump scheme.  The Court agrees.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES                          Date: December 18, 2025
                                                                                                                                                                    Page 9

> Credit Agreement, October 5, 2018, EHS and Skye both approved a "Certificate of Amendment" that increased the number of shares Skye could issue (at a par value of one cent a share) from 236 million to 500 million. …
>
> In accordance with the Multi Draw Credit Agreement, EHS began loaning Skye money and, in return, securing warrants to Skye shares. The timing of the loans coincided with Glauconix-related developments, as Skye's Board, which was owned and controlled by EHS, was privy to insider information. …
>
> With EHS's 50 cent-per-share warrants secured, Skye—with the approval of its board—aggressively pumped Skye's stock price, using false and misleading claims that were aggressively amplified to investors. … The scheme worked perfectly: Skye's stock soared, EHS exercised its warrants, and then dumped Skye shares. EHS's ownership of Skye dropped from 69% on March 29, 2019 to 54% on May 29, 2019 as EHS liquidated shares and locked in its fraudulent gains.[1]
>
> [n.1:] EHS and Skye continued their pump and dump scheme over time, and EHS's ownership of Skye ultimately ended up at 5% in 2023. …
>
> As the government's criminal investigation of Dhillon was proceeding, EHS and Skye altered their Multi Draw Credit Agreement. Specifically, on September 15, 2021, the parties terminated all further financing under the agreement. … Commensurate with this change, Skye instituted a brand new "Insider Trading Compliance Policy." … This new policy prohibited any directors, including any corporation controlled by directors, from securing warrants to purchase Skye stock while the directors were privy to insider information. This was exactly the Multi Draw Credit behavior that prevailed when EHS loaned Skye $6 million in late 2018 and early 2019. …
>
> EHS and Skye's Multi Draw Credit Agreement constituted a conventional insider trading and pump and dump scheme of the type about which the SEC has routinely warned investors, particularly with "small thinly traded companies" like Skye.

(Dkt. 288 at 5-8 (footnote and record citations omitted).)

                     a.        Statute of Limitations.

Cunning argues that all of the questions she asked Dhillon about this scheme "relate to conduct outside the statute of limitations, such that prosecution for that conduct is barred." (Dkt. 37 at 10.) She asserts, "The longest potential statute of limitations is six years. See 18 U.S.C. § 3282(a) (five years unless otherwise provided); 18 U.S.C. § 3301 (6 years for securities fraud under 18 U.S.C. § 1348)." (Dkt. 1 at 8.) She argues that the "crime of securities fraud was

Case 8:21-cv-00710-DOC-KES    Document 337    Filed 12/18/25    Page 10 of 14    Page ID #:11990

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES                                                    Date: December 18, 2025
                                                                                                    Page 10

complete when Emerald *purchased* Skye stock based on inside information, or when Skye *pumped* the stock using fraudulent misrepresentations," not when the stock was "dumped," which she previously asserted continued until through 2023. (Dkt. 37 at 17-18 (emphasis added); Dkt. 288 at 7 n.1 ("EHS and Skye continued their pump and dump scheme over time, and EHS's ownership of Skye ultimately ended up at 5% in 2023.").)

As Cunning admits, pump-and-dump schemes may violate § 10b of the Securities Act or the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. (Dkt. 37 at 16-17); see, e.g., United States v. Gordon, 710 F.3d 1124, 1128, 1141 (10th Cir. 2013) (noting that defendant "convicted of multiple criminal charges relating to his alleged participation in a 'pump-and-dump' scheme" was "charged under the general wire fraud statute, see 18 U.S.C. § 1343, and § 10b of the Securities Act of 1934, and the applicable rule promulgated thereunder, 17 C.F.R. § 240.10b-5," and noting that "prosecution for the manipulation of stock with the intent to defraud investors … ordinarily would give rise to violations of the wire fraud statute and Rule 10b-5").

While the latter is generally governed by a five-year statute of limitations, that time period may be extended under some circumstances. For example, "If the indictment 'specifically alleges a continuing conspiracy' to conceal the crime after the completion of the wire fraud, and such a conspiracy can be proven, the statute of limitations does not begin to run until the last overt act of concealment." United States v. Fattah, 914 F.3d 112, 170 (3d Cir. 2019) (citation omitted). Cunning argues that she is "not assert[ing] that" Puni Dhillon and Jim Heppel "were co-conspirators" with Dr. Dhillon, but merely that they were "board members who overlapped between EHS and Skye." (Dkt. 37 at 21.) Yet her prior opposition specifically alleged that EHS and Skye "conspiring" to defraud investors. (Dkt. 288 at 8.) It also appeared to allege that in 2021, the conspirators responded to a government investigation by "alter[ing] their Multi Draw Credit Agreement" and instituting a "brand new 'Insider Trading Compliance Policy'" at Skye. (Id. at 8-9.) This type of behavior might support an argument that the statute of limitations should be extended based on a conspiracy/cover-up.

Second, "the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 18 U.S.C. § 3293(2), … provides for a 10-year statute of limitations for the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, 'if the [charged] offense affects a financial institution.'" United States v. Bogucki, 316 F. Supp. 3d 1177, 1183 (N.D. Cal. 2018). Given Cunning's allegation that a credit agreement was part of the scheme, it is not clear to the Court whether this statute would be implicated as well.

Notably, Cunning's briefing is not internally consistent as to when she believes the statute of limitations began to run and ended. Her supplemental brief asserts that it began to run when "EHS obtained warrants in Skye stock between November 1, 2018 and March 29, 2019, and not on any date after March 29, 2019." (Cunning II, Dkt. 37 at 18.) However, her initial motion and the chart listing her argument as to each individual question suggests that the "fraud scheme ended in March 2018." (Id., Dkt. 1 at 8 n.6 (citing order in SEC v. Jumani, No. 3-21437

Case 8:21-cv-00710-DOC-KES   Document 337   Filed 12/18/25   Page 11 of 14   Page ID #:11991

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. 8:21-cv-00710-DOC-KES | Date: December 18, 2025 |
| | Page 11 |

(May 22, 2023), https://www.sec.gov/files/litigation/admin2023/33-11195.pdf); id., Dkt. 37 at 38 ("SEC has recognized that the OncoSec fraud ended in February 2018, see In re Jumani, SEC File No. 3-21437").)  Cunning's allegations about a supposed conspiracy, combined with her failure to identify its scope or end date, make it difficult for the Court to determine whether the applicable limitations periods have expired and, if so, when.

Overall, the court cannot "conclude[] with certainty that the relevant statute[s] of limitation have run."  Sec. & Exch. Comm'n v. Pence, 323 F.R.D. 179, 190 (S.D.N.Y. 2017) (citation omitted); see, e.g., United States v. Paksn, Inc., No. 15-cv-09064-SBA-GRx, 2022 WL 21796686, at *2, 2022 U.S. Dist. LEXIS 24725, at *4 (C.D. Cal. Dec. 13, 2022) (finding witness could invoke the Fifth Amendment with regard to questions about a kickback scheme because the record was "not clear as to when the statute of limitations commenced or expired," in part because it was unclear when the witness withdrew from the alleged conspiracy).

    b.  Public Information or Documents.

Cunning argues, "Dhillon continues to assert the Fifth Amendment in response to questions about publicly available factual information, but courts have recognized that answering such questions does not create a risk of prosecution, and courts have overruled invocations in response to such questions."  (Cunning II, Dkt. 37 at 11.)

In support of this argument, she cites Universal Trading & Inv. Co v. Kiritchenko, No. C-99-03073, 2007 WL 2471432, 2007 U.S. Dist. LEXIS 66782 (N.D. Cal. Aug. 27, 2007).  There, the court ruled that "certain questions were not privileged under the Fifth Amendment, such as whether [the witness] had ever been arrested by the Swiss government or ever posted bail in Switzerland, or other publicly available information." 2007 WL 2471432, at *1.  However, the court ruled that the witness could assert the Fifth Amendment to questions about his "recognition of signatures or documents, knowledge of persons or companies, ownership of companies' stock, ownership of bank accounts or properties, knowledge of or participation in financial transactions, and knowledge of conversations with or actions by alleged co-conspirators."  Id. at *2.

Although some questions that Cunning asked Dr. Dhillon do resemble the questions in the former category, these are largely questions in the "yellow" category that he has now agreed to answer (as discussed further below).  The questions in the "green" category more closely resemble the latter category that the court found could implicate Fifth Amendment concerns.  For example, in Questions #33-36, Dhillon was asked to confirm that a trial exhibit was an accurate representation of the multi-draw credit agreement between EHS and Skye and how he interpreted that agreement.  This agreement was a major feature of the alleged Skye pump-and-dump scheme (as discussed above).  Even if many of these facts can be publicly confirmed, answering them in a deposition could be used to confirm Dhillon's knowledge of those facts and prove intent.  Accordingly, Dhillon may properly invoke the Fifth Amendment as to these questions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:21-cv-00710-DOC-KES                                          Date: December 18, 2025
                                                                                              Page 12

c.     Questions About Cunning's Termination.

Cunning argues that answering questions about why she was terminated would not create a reasonable fear of criminal prosecution because "the Sarbanes-Oxley whistleblower retaliation statute and the California Whistleblower Protection Act statutes are both civil in nature, not criminal," and the "criminal anti-retaliation statute, 18 U.S.C. § 1513, would have required retaliation for providing information to law enforcement," which Cunning did not do. (Dkt. 37 at 13-14.)

However, in the same filing that described the alleged Skye pump-and-dump scheme, Cunning argued that she was terminated in part because she was aware of and refused to participate in that scheme. (See Cunning I, Dkt. 288 at 9 ("Cunning observed Skye's (and EHS's) insider training and pump and dump behavior first-hand, refused to participated in it, complained to Murphy about the behavior, and tried to correct the behavior. … As a result, she was terminated.").) If this is true, answering questions about why she was terminated could connect Dhillon to that scheme.

**B.**     **Questions Dhillon Now Agrees to Answer (Yellow Category).**

These questions fall into several general categories:

- Questions about deposition and trial procedure and preparation. See Question #1 ("How many times have you been deposed before?"); Question #16 (asking if Dhillon is willing to testify at the retrial); Question #21-22, 87 (asking if Dhillon was reading from notes and if so asking to see them); Question #66 (asking about document collection procedures); Questions #84-86 (asking how Dhillon prepared for the deposition).

- Questions about the Fifth Amendment invocations themselves. See Question #3 ("Which Counsel is it that has advised you to invoke the Fifth Amendment?"); Questions #4, 5 (explaining Cunning's counsel's understanding of how to properly invoke the Fifth Amendment); Question #8 (advising Dhillon he could be sanctioned for improperly invoking the Fifth Amendment); Question #9 (asking if Dhillon agreed with an argument in Skye's appellate brief about the Fifth Amendment assertions); Questions #10-12 (asking if Skye's attorney represented Dhillon in prior proceedings); Question #15 (asking whether Dhillon improperly invoked the Fifth Amendment in response to trial questions about his medical license).

- Asking Dhillon to confirm information in publicly available documents. See Question #7 (asking Dhillon to review Skye's appellate brief and confirm its assertion that he pleaded guilty to "for several of the crimes that you were charged with); Question #31-32, 53-55 (asking about Dhillon's and others' titles and roles at Skye and EHS).

Case 8:21-cv-00710-DOC-KES   Document 337   Filed 12/18/25   Page 13 of 14   Page ID #:11993

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES                                         Date: December 18, 2025
                                                                                                       Page 13

- Questions about Dhillon's medical license. See Question #13 (asking if Dhillon used to have a medical license); Question #14 (asking if his medical license was revoked).

The Court agrees that—as Dhillon now essentially admits—he did not have a reasonable fear of prosecution based on answering these questions and therefore improperly invoked the Fifth Amendment. However, the next question is what remedy Cunning is entitled to, given that Dhillon has now answered these questions and offered to do so formally in the form of a stipulation.

### 1.    Re-Opening the Deposition.

Cunning asks for an order compelling Dhillon to answer questions at a continued deposition. (Dkt. 1 at 2; Dkt. 37 at 5.) Yet the questions in this category are either of dubious relevance to Cunning's underlying claims or the answers could be determined by reviewing publicly available documents. See generally Fed. R. Civ. P. 26(b)(1). Although Cunning is correct that she is not *required* to agree to a stipulation in lieu of a deposition (Dkt. 37 at 6), she is required to "make every effort to stipulate to facts upon which the parties know or have reason to know there can be no dispute." Local Rule 16-2.2. These questions are about facts that fall squarely within that category. Given the Court's finding that Dhillon properly invoked his Fifth Amendment rights as to the questions in the more substantive "green" category, and given the quickly approaching February 2026 trial date, the Court finds that re-opening the deposition to allow Cunning to ask these questions alone would not be efficient or in the interests of justice.

### 2.    Monetary Sanctions.

Cunning seeks an "award of fees and expenses related to the deposition and subsequent briefings and hearings" under Federal Rule of Civil Procedure 30(d)(2). (Dkt. 37 at 50.) That rule states, "The court may impose an appropriate sanction--including the reasonable expenses and attorney's fees incurred by any party--on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). Cunning also seeks sanctions against Dhillon and his attorney under Federal Rule of Civil Procedure 37(a)(5). (Dkt. 37 at 50-51.) That rule states that, where a motion to compel is granted, the court "must" require the party whose conduct necessitated the motion "to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees" unless the behavior was "substantially justified" or such an award would be "unjust." Fed. R. Civ. P. 37(a)(5)(A).

The Court finds that an award of sanctions is not appropriate based on the unique facts of this case. Dhillon's invocations of his Fifth Amendment rights were substantially justified. As discussed above, he did have a reasonable fear of prosecution as to most of the questions asked. For the other questions, his invocations were understandable in light of his limited access to counsel and documents prior to the deposition, due to his incarceration in ICE custody. (See Dkt. 5 at 13-14; Dkt. 38 at 25.) He later agreed to answer the other questions via stipulation.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:21-cv-00710-DOC-KES   Date: December 18, 2025
                                 Page 14

## IV.   CONCLUSION

For the foregoing reasons, Cunning's motion to compel (Dkt. 330) is **granted in part** and **denied in part**.  The parties shall meet and confer about Dhillon's answers to the yellow category questions (discussed above in Section III.B) and either (1) file a joint stipulation agreeing to the asked-about facts on or before **January 15, 2026**, or alternatively (2) if the District Judge requires the parties file a new proposed Pretrial Conference Order for the continued February 10, 2026 trial, they may include the stipulated facts in that order.

Initials of Deputy Clerk jd